IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION


**CEDRIC ANTONIO BRYANT,**

    **Petitioner,**

vs.

                                            **CASE NO. 4:09cv450-SPM/WCS**

**KENNETH S. TUCKER, Secretary,**
**Florida Department of Corrections,**[1]

    **Respondent.**

    _____/

## REPORT AND RECOMMENDATION

This is an amended petition for writ of habeas corpus filed by Cedric Antonio Bryant pursuant to 28 U.S.C. § 2254. Doc. 6. Petitioner challenges his convictions for burglary of an occupied structure while wearing a mask (count I) and grand theft (count

---

[1] On August 24, 2011, Kenneth S. Tucker succeeded Edwin G. Buss as the Secretary of the Florida Department of Corrections, and is automatically substituted as Respondent. Fed.R.Civ.P. 25(d).

II), case number 2003 CF 3165, in the Circuit Court of the Second Judicial Circuit, in and for Leon County, Florida. *Id*. He was sentenced to a prison term of 30 years as a prison releasee reoffender on count I and a consecutive 5 years on count II. Doc. 20, p. 2.

Respondent filed an answer and the record in paper form. Doc. 20. References herein to exhibits are to the record in paper form. Petitioner filed a traverse. Doc. 29. Respondent agrees that the petition was timely filed. Doc. 20, p. 6.

**Summary of the trial evidence**

In the early morning hours of September 11, 2003, the McDonald's restaurant on Thomasville Road in Tallahassee, Florida, was burglarized and money was taken from the safe. The burglary was planned by Petitioner and Rashad Robinson.

The burglary had been reported to the police by an eye witness, Carlos Avila, who was then working at the restaurant. At about 1:30 a.m. that day, Avila saw a man in the manager's office squatting down. Avila said that the man wore a Halloween mask, had a knife in his right hand, and had a plastic bag with money in his left hand. Ex. I (initial brief on appeal), p. 10.[2] The person was also described by Avila as wearing a white T-shirt, blue pants, and black shoes, but Avila could not see the man's face. *Id*. Avila testified, however, that he saw the man in the lobby and identified him as Petitioner. *Id.*, p. 11.

---

[2] While this evidence was presented during the motion to suppress hearing, essentially the same evidence was repeated at trial.

Case No. 4:09cv450-SPM/WCS

Officer Max Suarez of the Tallahassee Police Department was the first to arrive on the scene.  *Id.*, p. 9.  Although he had trouble communicating with Avila, who spoke mainly Spanish, Avila described the man he saw and within a minute, Suarez put out a "be on the lookout" (BOLO).  *Id.*  Suarez had arrived less than five minutes after the dispatch.  *Id.*

Deputy Dean Crump testified that at 1:31 a.m. he received the BOLO and was dispatched to the vicinity of the McDonald's.  *Id.*, p. 3.  He heard that a weapon was involved in the robbery.  *Id.*, p. 5.  Less than ten minutes after the dispatch, he saw a black male in a white T-shirt, dark colored pants, and dark shoes (generally as described in the BOLO), crossing Thomasville Road from west to east behind him and entering the Books-a-Million parking lot.  *Id.*, p. 3.  Crump stopped his vehicle facing the suspect, put on his spotlight, and drew his handgun.  *Id.*, p. 4.  The suspect walked toward him and said something like "dang," but did not ask why he was stopped.  *Id.*  The suspect, Petitioner, was placed into handcuffs, patted down, and $110 in cash in small bills and a deposit slip with a McDonald's logo printed on it were recovered from Petitioner's front pocket.  *Id.*  *Miranda* rights were read to Petitioner, and Petitioner said "his partner had dipped on him."  *Id.*, p. 5.  In the location where Petitioner had been seen going through a hedge to the parking lot, a deposit bag from McDonald's containing money was found.[3]  *Id.*

Officer Nathan Barker testified at trial that after Petitioner had been read his rights, he said he was "not going down on this alone."  *Id.*, p. 12.  He said that a friend

---

[3] The bag contained over $2000.00 in cash.  Ex. E, pp. 64-65.

had picked him up that night, drove him to the McDonald's. *Id*. He said that Carlos Avila saw him and seemed to recognize him. *Id*. He said that his friend left him in the truck, and when he returned, he threw a bag of money at him and told him to meet across the street. *Id*.

Carlos Avila testified that although the person who committed the burglary wore a mask, he watched the person through a security monitor after the person took off the mask and he recognized Petitioner.[4] *Id*., p. 13. He gave the police a description, and he was taken to the parking lot where Petitioner had been arrested and identified him. *Id*. Avila was sure that the person he saw was Petitioner, not Rashad Robinson. *Id*.

Rashad Robinson testified that he and Petitioner had worked at the McDonald's and planned to take money from the safe. *Id*., p. 13. He dropped Petitioner off at the McDonald's and waited in the parking lot. *Id*. Petitioner took a screwdriver with him, and planned to enter through the freezer in back, which was not locked. *Id*. Robinson was supposed to be the get-away driver, but became afraid and left. *Id*. He pled guilty to burglary and grand theft, but had not yet been sentenced when he testified. *Id*., p. 14.

At this point in the trial, counsel for Petitioner asked for a continuance so that he could obtain the presence of Officer Suarez, who was then in Las Vegas. *Id*., p. 14. Counsel had not subpoenaed Suarez, and felt he had made a mistake because he believed that Suarez had said in deposition that Avila did not identify Petitioner "as the

---

[4] He testified at trial that he recognized Petitioner as the person who took the money because he knew Petitioner from work at McDonalds. Ex. E, p. 104.

person he saw outside and at the lineup." *Id*.  The motion for a continuance was denied.  *Id*.

Detective Todd Lombardo said that after *Miranda* rights, Petitioner gave another statement.  *Id.*, p. 15.  He said that he and Rashad Robinson had planned for a week to break into the safe and take money because Robinson had the safe combination.  *Id*.  Petitioner said that Robinson let him out, he gained entrance to McDonald's, and was getting money out of the safe when he was interrupted by Avila.  *Id*.  Petitioner ran, threw some money at Robinson, and told Robinson to meet him across the street.  *Id*.  Petitioner said he took the money bag to the place where Robinson was to pick him up, but Robinson did not arrive.  *Id*.

A latent palm print and partial fingerprints on the McDonald's deposit receipt matched Petitioner's prints.  *Id.*, p. 15.

Petitioner testified that Robinson came up with the idea of the burglary.  *Id.*, p. 16.  Petitioner said that he backed out, but Robinson went ahead.  *Id*.  He said he had to wait in Robinson's truck because he had no other way home.  *Id*.  He said that when Robinson did not return, he left the truck and started walking.  *Id*.  He said that at the fence line behind McDonald's, Robinson appeared, gave him the bag of money, and told Petitioner to meet him in the parking lot across the street.  *Id*.  He admitted that he told the officer when arrested that his partner had left him.  *Id*.  He admitted he had been convicted of seven felonies.  *Id*.

**Section 2254 Standard of Review**

The court may grant federal habeas corpus relief to "a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

Where, as here, the Petitioner has presented his federal claims to the state courts and those claims have been adjudicated on the merits, review is limited. The state court's determination of a factual issue is presumed correct, unless the petitioner can rebut the presumption by clear and convincing evidence. § 2254(e)(1). If the petitioner failed to develop the factual basis for a claim in state court, an evidentiary hearing in § 2254 proceedings is limited by § 2254(e)(2). See also Cullen v. Pinholster, 131 S.Ct. 1388, 1398, 179 L.Ed.2d 557 (2011) (holding that review under § 2254(d)(1), addressed ahead, "is limited to the record that was before the state court that adjudicated the claim on the merits," so the federal court may not rely on new evidence developed in the § 2254 proceedings).[5]

Further, the petitioner must show that the state court's adjudication of the claim:

  (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;  or

  (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

---

[5] Cullen did not address whether a district court could choose to hold a hearing under § 2254(e)(2) to determine whether § 2254(d)(2) was satisfied. 131 S.Ct. at 1401, n. 8 and 1411, n. 20.

§ 2254(d).

> Section 2254(d) is part of the basic structure of federal habeas jurisdiction, designed to confirm that state courts are the principal forum for asserting constitutional challenges to state convictions. Under the exhaustion requirement, a habeas petitioner challenging a state conviction must first attempt to present his claim in state court. 28 U.S.C. § 2254(b). If the state court rejects the claim on procedural grounds, the claim is barred in federal court unless one of the exceptions to the doctrine of *Wainwright v. Sykes*, 433 U.S. 72, 82–84, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), applies.[6]  And if the state court denies the claim on the merits, the claim is barred in federal court unless one of the exceptions to § 2254(d) set out in § § 2254(d)(1) and (2) applies.  Section 2254(d) thus complements the exhaustion requirement and the doctrine of procedural bar to ensure that state proceedings are the central process, not just a preliminary step for a later federal habeas proceeding, *see id.*, at 90, 97 S.Ct. 2497.

Harrington v. Richter, 562 U.S. ___, 131 S.Ct. 770, 787, 178 L.Ed.2d 624 (2011). If the state court issues an opinion, it need not cite or even be aware of controlling Supreme Court cases under § 2254(d). *Id.*, 131 S.Ct. at 784 (citation omitted). Further,

> [w]here a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief. This is so whether or not the state court reveals which of the elements in a multipart claim it found insufficient, for § 2254(d) applies when a "claim" not a component of one, has been adjudicated.

*Id.*

For an ineffectiveness of counsel claim, the "clearly established" standard is set forth in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Under Strickland, "[a] convicted defendant making a claim of ineffective assistance of counsel must identify the acts or omissions of counsel that are alleged not to have been

---

[6] To excuse a procedural default, as noted in Wainwright and the cases cited *supra*, a petitioner must demonstrate either cause and prejudice or actual, factual innocence.

Case No. 4:09cv450-SPM/WCS

the result of reasonable professional judgment." 466 U.S. at 690, 104 S.Ct. at 2066.  In determining whether counsel gave adequate assistance, "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." 466 U.S. at 690, 104 S.Ct. at 2066.  Petitioner has a heavy burden, as he must show that "no competent counsel would have taken the action that his counsel did take." Fugate, 261 F.3d at 1217 (citation omitted).  There are no rigid requirements or absolute duty to investigate a particular line of defense, and "more is not always better." Id. (citations omitted).

Even if deficient performance is demonstrated, a petitioner must also show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694, 104 S.Ct. at 2068. It must be "reasonably likely" the result would have been different; "[t]he likelihood of a different result must be substantial, not just conceivable." Harrington, 131 S.Ct. at 793 (citations omitted).

> The Strickland standard itself is hard to satisfy, but:
>
> Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) *is all the more difficult.*  The standards created by *Strickland* and § 2254(d) are both "highly deferential," and when the two apply in tandem, review is "doubly" so.  The *Strickland* standard is a general one, so the range of reasonable applications is substantial.  Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d).  When § 2254(d) applies, the question is not whether counsel's actions were reasonable. *The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.*

Harrington, 131 S.Ct. at 788 (citations omitted, emphasis added).

**Legal analysis**

   **Ground one**

Petitioner's first claim is that he was subjected to an illegal search when the deputy sheriff reached into his pocket and seized evidence.  Doc. 6, p. 4.

This court is "barred from hearing Fourth Amendment claims in a federal habeas corpus proceeding."  Lawhorn v. Allen, 519 F.3d 1272 (11th Cir. 2008), relying on Stone v. Powell, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976).  Stone held:

> [W]here the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial.

428 U.S. at 494, 96 S.Ct. at 3052 (footnotes omitted).

> " '[F]ull and fair consideration' in the context of the Fourth Amendment includes 'at least one evidentiary hearing in a trial court and the availability of meaningful appellate review when there are facts in dispute, and full consideration by an appellate court when the facts are not in dispute.' " *Bradley v. Nagle*, 212 F.3d 559, 565 (11th Cir.2000) (*quoting Caver*, 577 F.2d at 1191).[7]  Although "sometimes 'full and fair consideration' means consideration by two tiers of state courts[;] sometimes it requires consideration by only one."  *O'Berry v. Wainwright*, 546 F.2d 1204, 1213 (5th Circuit 1977).

Lawhorn, 519 F.3d 1287.

Petitioner had an evidentiary hearing in state court on his motion to suppress.  Ex. C.  A written opinion denying the motion was entered.  Ex. D.  Petitioner appealed

---

[7] Caver v. State of Ala., 577 F.2d 1188, 1192 (5th Cir.1978).

the issue, without success.  Exs. I and L.  He had full and fair consideration of this claim.

Petitioner argues that this court is not required to apply Stone v. Powell because § 2254 should be available to address any deprivation of a federal constitutional right. Doc. 29, p. 3.  The court, however, must apply established precedent.  Ground one affords no relief.

**Grounds two and three**

In ground two, Petitioner contends that his trial counsel was ineffective because he did not call Officer Max Suarez as a witness.  Doc. 6, p. 4.  He contends that Officer Suarez testified at the suppression hearing "that he was told by the state's key witness, Carlos Avila, he [Avila] could not positively identify petitioner on the morning of the show-up and burglary."  *Id.*  He contends that Officer Suarez would have so testified at trial.  Petitioner asserts: "Eyewitness identification evidence, uncorroborated by a fingerprint, gun, confession, or coconspirator testimony, is a thin thread to shackle a man for forty years."[8]  Doc. 29, p. 12.

In ground three, Petitioner makes the same claim in a different way.  He contends that his trial counsel failed to impeach Avila as to his prior inconsistent statements in his deposition and at the suppression hearing about his ability to identify Petitioner on the night of the offense. *Id.*

---

[8] As will be seen ahead, there was corroboration by fingerprints, conconspirator testimony, and Petitioner's confession, and there was no gun involved.

The Rule 3.850 court wrote extensively as to these related claims. Ex. P, R. 214-230. The court rejected ground two, finding that the "issue" of denial of a continuance or failure to secure Suarez's testimony should have been raised on direct appeal. Ex. P, R. 221-222.

This was incorrect. The issue of the denial of the motion for a continuance was a potential trial error, but Petitioner's claim in his Rule 3.850 motion was that ineffective assistance of counsel caused the trial error. The ruling, therefore, did not address the Sixth Amendment claim. The second basis for the ruling, failure to call Suarez as a witness, is the ineffectiveness claim, but such a claim normally cannot be raised on direct appeal.

> With rare exception, ineffective assistance of counsel claims are not cognizable on direct appeal. *See Martinez v. State*, 761 So. 2d 1074, 1078 n. 2 (Fla. 2000); *Kelley v. State*, 486 So. 2d 578, 585 (Fla. 1986); *State v. Barber*, 301 So. 2d 7, 9 (Fla. 1974); *see also Blanco v. Wainwright*, 507 So. 2d 1377, 1384 (Fla. 1987). This is so because an appellate court must, under normal circumstances, confine itself to "review of only those questions" that were before the trial court and upon which a "ruling adverse to the appealing party was made." *Barber*, 301 So. 2d at 9. An ineffective assistance of counsel claim may be brought on direct appeal only in the "rare" instance where (1) the ineffectiveness is apparent on the face of the record, and (2) it would be "a waste of judicial resources to require the trial court to address the issue." *Blanco*, 507 So. 2d at 1384. A defendant who asserts ineffective assistance of counsel bears the burden of establishing as much. *Id.* at 1381.

Ellerbee v. State, --- So.3d ----, 2012 WL 652793, *6 (Fla. Mar 1, 2012) (No. SC10-238); Gore v. State, 784 So. 2d 418, 437 (Fla. 2001). Consequently, these reasons for rejecting the claim are not entitled to this court's deference.

The trial court did, however, fully consider the merits of this Strickland claim. Ex. P, R. 222-230. The predicate for Petitioner's claims in this court is the following.

At the motion to suppress hearing, Officer Max Suarez testified that he is fluent in Spanish and spoke to Carlos Avila in Spanish. Ex. C, p. 68. He said that Avila said that the burglar was a thin, average height (about six feet), black male, wearing a white shirt, dark pants, and dark shoes. *Id.*, pp. 69-70. The burglar wore a Halloween mask with the tongue sticking out. *Id.*, p. 70. Suarez put out that description immediately on the BOLO. *Id.*, p. 71. He used the signal zero, which indicated that the suspect was armed with a weapon, and Avila said it was something sharp, possibly a knife. *Id.*, pp. 73, 75. He noted in his report that Avila could not positively identify the suspect because the suspect was wearing a mask. *Id.*, p. 74.

Carlos Avila testified at the motion to suppress hearing that when he went to the manager's office after hearing a noise, he saw a person squatting by the safe with a knife in his right hand and a plastic bag with money in it in his left hand. *Id.*, p. 77. The mask was white with a tongue sticking out. *Id.*, p. 78. The person had a short sleeve white T shirt on. *Id.*, p. 79. He said "he was a good worker and I saw that – I saw his face before this problem occurred." *Id.*, p. 81. He said that when he dialed 911, he saw the person "in front of the lobby area and at that time he was not wearing a mask." *Id.* He said that when he saw the person's face, "it to me was a great surprise when I realized who it was. I was shocked." *Id.*, p. 82. He said: "It was a boy who works very well. Can I tell you his name?" *Id.* Avila then said the name, which was transcribed phonetically as "Alexor Cerri" or "Cerrie" or "Cedry." *Id.* He identified Petitioner as the

person. *Id.*, p. 83. He said "he asked me to come to the patrol car, and I identified him." *Id.* At the parking lot, "he asked this person to get out of the car and then asked me if I could identify him and I said yes. And when I saw him I told the police officer, yes, it is him." *Id.* Avila said he did not give the officer the person's name then. *Id.*, p. 84. He denied that he had given the name of the person, that he only said "yes" when asked if that was the person. *Id.*

At trial, Avila testified that he was doing maintenance work at the McDonald's on September 11, 2003. Ex. E, pp. 101-102. He said that at 1:30 a.m., he heard a "distinct, different sound" and when he investigated, he saw a person bent over, squatting down, wearing a mask, next to the safe in the manager's office. *Id.*, p. 102. In his left hand was a plastic bag with money in it and in his right hand was a knife. *Id.*, p. 103. The person confronted Avila, and Avila thought he would be killed with the knife. *Id.* He could not see the person's face. *Id.* Avila watched on the security monitor as the person exited from the refrigerator door to the outside of the McDonald's and then saw him through the window in front of McDonald's, and noticed his "manner of dress." *Id.*, p. 104. He said he was taken to where "they detained him and then I was invited to come to where he was and then I told them that, yes, he was the person." *Id.* Avila said he knew him as "Cedric." *Id.* He said that Cedric took the money from the safe. *Id.* He then identified Petitioner as the person. *Id.*, p. 105.

On cross examination, Petitioner's counsel established that Avila told the police about the "form" of the person, and how he looked, but he never told the police who he was. *Id.*, p. 107. But he insisted that when he was taken by the police to view

Petitioner, he told them "this is the person," the one he saw in the manager's office. *Id.*, pp. 107-108. He said that the person had on a white T-shirt with a round collar, but with no "straps." *Id.*, p. 109. On redirect, Avila said that the person who had been in the manager's office did not have a mask on when he saw him exit on the security monitor and when he saw him through the window as he passed the front of the store. *Id.*, p. 111. He was then asked whether Petitioner[9] was the person Avila saw inside the McDonald's and Avila said "no." *Id.* Oddly, on recross, Avila said that Petitioner was not the person he saw outside McDonald's without a mask on, and he said: "Never seen him – this is the first time I have seen him today." *Id.*, p. 112.

The Rule 3.850 court determined that the record revealed no attorney error or prejudice to the outcome. Ex. P, R. 215. First, the court reasoned that Petitioner admitted most of the elements of the offense. *Id.*, R. 215-217. This finding is fully supported by the record cited. Petitioner testified that he was employed at that McDonald's with Rashad Robinson, and he and Robinson came up with a plan to steal money from the store by entering through the freezer door in the back. Ex. E, R. 237-239. Petitioner said he expressed misgivings about the crime to Robinson, and told Robinson, "you can go ahead and do it." *Id.*, R. 243. He waited for Robinson for 15 to 20 minutes, then got out of the vehicle and walked toward the back of McDonald's and Robinson came out running, handed Petitioner the money in a blue pouch, and told

---

[9] Both lawyers asked Avila to state whether "this person" was the person he saw at McDonald's that night, and neither lawyer made it clear on the record that they were pointing to Petitioner. Ex. E, p. 112. It is only assumed that they were pointing to Petitioner when they asked these questions, but the assumption, in context seems reasonable since no one else had been identified.

Petitioner to meet him at the Albertson's parking lot. *Id.*, R. 244-246. Petitioner said he took $172 out and put it into his pocket, and "the rest of it, you know, it was in the plastic bag they said they got off me." *Id.*, R. 246, 252. He admitted that he also had a McDonald's deposit slip in his pocket. *Id.*, R. 252. Petitioner testified that he crossed Thomasville Road and put the money bag into a hedge. *Id.*, R. 253. Petitioner's trial testimony alone was enough to convict Petitioner as a principal, for aiding and abetting Robinson. It was not attorney error not to call Suarez as a witness.

The court also reasoned that testimony from Suarez was not needed because another witness testified at trial that Avila was not able to identify Petitioner at the show-up after Petitioner had been arrested in the parking lot. Ex. P, R. 222. This reasoning is also persuasive and supported by the record. On cross examination of Detective Todd Lombardo, Petitioner's attorney established that Lombardo was told that Avila at the show-up "said that there [sic, they or he] were of similar build, similar clothing, but [the officers] weren't told Mr. Avila said that that's the man." Ex. E, p. 191. Counsel also established that Avila spoke Spanish, and had difficulty with English. *Id.*, p. 192. When later asked whether Suarez ever said that Avila identified Petitioner as the person he saw outside McDonald's, that Avila identified Petitioner, Lombardo said "not in those words, no, sir." *Id.*, p. 193. The court noted that this was precisely the same testimony as Suarez gave at the suppression hearing, so Suarez was not needed. Ex. P, R. 225. This is supported by the record. Suarez said at the suppression hearing that in his report he had noted that Avila could not positively identify the burglar because the burglar was wearing a mask. Ex. C, p. 74.

In addition to these reasons for denying the ineffectiveness claims, the Rule 3.850 court determined that (1) the evidence of guilt was overwhelming), (2) Rashad Robinson, the co-defendant, gave testimony that incriminated Petitioner,  (3) Petitioner's testimony included multiple inculpatory admissions and his credibility was attacked by seven felony convictions, (4) Petitioner was caught within minutes of the 911 call with a McDonald's deposit slip and cash in his pocket, and with the McDonald's bag full of cash and Petitioner's fingerprints in it, and (5) Petitioner confessed after *Miranda* warnings.  *Id.*, R. 226-229.  For all of these reasons, Petitioner has not shown that the state court's rejection of grounds two and three has "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" as required by § 2254(d)(1).

**Ground four**

In ground four, Petitioner contends that his attorney was ineffective for failing to move for judgment of acquittal.  Doc. 6, p. 5.  Petitioner argues that the evidence was insufficient, specifically arguing that while latent fingerprints of value were found inside the McDonald's building, none compared to Petitioner's fingerprints.  *Id.*

A motion for judgment of acquittal in Florida is governed by a standard favorable to the prosecution:

> A motion for judgment of acquittal should not be granted "unless the evidence is such that no view which the jury may lawfully take of it favorable to the opposite party can be sustained under the law." *Lynch v. State,* 293 So. 2d 44, 45 (Fla.1974).

Kopsho v. State, --- So.3d ---- , 2012 WL 652790, *10 (Fla. 2012) .  "Generally, a trial court should not grant a motion for judgment of acquittal unless, when viewed in a light most favorable to the State, the evidence does not establish a prima facie case of guilt." Bussell v. State, 66 So.3d 1059, 1061 (Fla. 1st DCA 2011).

In denying this claim, the Rule 3.850 court determined that Petitioner's attorney testified at the Rule 3.850 evidentiary hearing that he did not have a basis to move for judgment of acquittal.  Ex. P, R. 213.  The court rejected this claim of ineffectiveness, finding the evidence of guilt to have been "overwhelming."  Id. and R. 214, n. 1.  This is plainly correct from this court's review of the evidence set forth above.  Petitioner has not shown that the state court's rejection of ground four has "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" as required by § 2254(d)(1).

**Certificate of Appealability**

Section 2254 Rule 11(a) provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."  A timely notice of appeal must still be filed, even if the court issues a certificate of appealability.  § 2254 Rule 11(b).

I find no substantial showing of the denial of a constitutional right.  § 2253(c)(2); Slack v. McDaniel, 529 U.S. 473, 483-84, 120 S.Ct. 1595, 1603-04, 146 L.Ed.2d 542

(2000) (explaining how to satisfy this showing) (citation omitted).  Therefore, I recommend that the court deny a certificate of appealability in its final order.

The second sentence of Rule 11(a) provides:  "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue."  The parties shall make any argument as to whether a certificate should issue by objections to this report and recommendation.

 Conclusion

Accordingly, it is **RECOMMENDED** that petition for writ of habeas corpus filed by Cedric Antonio Bryant pursuant to 28 U.S.C. § 2254, challenging his convictions for burglary of an occupied structure while wearing a mask (count I) and grand theft (count II), case number 2003 CF 3165, in the Circuit Court of the Second Judicial Circuit, in and for Leon County, Florida, be **DENIED WITH PREJUDICE**, and that a certificate of appealability be **DENIED** pursuant to § 2254 Rule 11(a).

**IN CHAMBERS** at Tallahassee, Florida, on March 27, 2012.


s/    William C. Sherrill, Jr.
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**


**NOTICE TO THE PARTIES**

**A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 14 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**

Case No. 4:09cv450-SPM/WCS